*129 Curia, per
Wardlaw, J.
It was correctly held on the circuit that, in a case like this, a purchaser at sheriff’s sale acquires the rights of any creditor to whose execution the sheriff’s authority may be referred. Notice of the opposing claimant’s rights, had by the purchaser, is of no consequence, if the creditor, at the time of extending credit to the debtor, had not such notice. If this were not so, public notice given before the sale would either prevent the sale altogether, so that the creditor’s right to treat the fraudulent transaction as void would be a mockery, or it would confine the competition in the bidding to the creditors and the claimant; a result which might be disastrous to the debtor and to every one whose interest would be promoted by a fair sale.
Taking with us the proposition thus established, we proceed to consider the sixth ground of appeal, in connection with the observations made thereon in the report. The question involved is well calculated to suggest cautious inquiry concerning the preference of subsequent creditors to prior ones, and the priority of senior executions (o junior ones, when these two rights seem to come into opposition in the course of a sheriff’s execution of various writs of fi. fa. against the same debtor. Here we have the case of a contract between father-in-law and son-in-law supposed to be invalid, because of the constructive fraud thereby operated upon the subsequent creditors of the son-in-law: but the question is not confined to cases like this — it extends to cases of unrecorded mortgages, and of interests in the vendor, reserved by verbal agreement upon a sale of chattels, which may arise under the Act of 1843, (11 Stat. 256,) and to cases of parol gifts of chattels, unaccompanied by delivery, which may arise under the Act of 1832, (6 Stat. 482,) and indeed to all cases where a transaction is void as to subsequent creditors, which is valid as to the parties and prior creditors.
Treating as a nullity a transaction which the law considers to be void as to him, a subsequent creditor causes a levy to be made under his fi. fa. upon chattels, as the property of his debtor, which, as to prior creditors of that debtor, belong to a third person, the *130 opposing claimant. The sheriff sells, but the money is instantly by law appropriated to the oldest fi. fa. against a debtor, being the fi. fa. of a prior creditor (see Cooper vs. Scott, 2 McMull. 155): and thus the subsequent creditor is defeated of all enjoyment of what his rights have produced, and the prior creditor takes what would have been beyond his reach but for the accident of there being in the sheriff’s hands the fi. fa. of a subsequent creditor junior to his.
If, in the case before us, Ford or any person for him had paid to the subsequent creditors the whole amount due to them, or had even paid the same to the sheriff, with special instructions that application should be made to the executions of those creditors, (Adams vs. Crimager, 1 McMull. 309,) there would no longer have been authority in the sheriff to treat the slaves in question as the property of Elkin. If the parties to this suit and all the creditors had been before a Court of Equity, their relative rights could have i een settled, and suitable orders have been made accordingly. Perhaps even in a court of law, in a contest for the money in the sheriff’s hands, after all the facts had been ascertained, the exclusive right of the subsequent creditors to treat the slaves sold as the property of the common debtor, might prevail over the prior hen which the older execution ordinarily gives. But the case now presented regards the right of the purchaser from the sheriff — in effect, the authority of the sheriff to sell.
Was the sheriff bound to stop his sale when enough to pay certain subsequent creditors had been raised? If so, and the sheriff, under the prior lien, paid to older executions, the subsequent creditors would have been only cheated by a formal recognition of their rights, whilst the substantial fruits went to others. If the sheriff stopped and kept the proceeds in his hands, to abide the order of the Court, he was bound to have enough to satisfy all subsequent creditors before he stopped, and then upon him was thrown the decision of the grave and difficult questions of law and fact often involved in such contests. How was he to know the time and circumstances of the imputed fraud; and *131 having only the writs of fi. fa. in his hands, what information did he possess of the time when each creditor extended credit? How could he distinguish not only between executions, whose dates he knew, but between two creditors, whose executions were both lodged subsequent to a fixed time, but were founded on debts of which one was contracted before and the other after that time ? Supposing him to have fixed satisfactorily the time of the fraudulent transaction, and the true time of every credit as it was originally extended, however complicated by renewals and changes the securities taken for it may have been, how could he determine the disputes which so often vex courts and juries concerning the notice which each creditor may have had, that deprived him individually of the right to complain of that, whereby others may have been deceived ? The impossibility of a sheriff’s settling the questions which every such case presents, shews that, in determining the extent of his authority, no rulé can be prescribed but the ordinary rule of our law and practice, that he must regard all the writs of fi. fa. against the same debtor as entitled to payment in the order of their priority, and of consequence that his levy and sale mrder a junior fi. fa. must be measured not by it only, but by it and all those which have priority over it. His authority to sell under a junior fi. fa. ceases not until it be paid — and it cannot be paid from sales until all older ones have been first satisfied.
An indemnity to the sheriff has been suggested as a means of relieving him from embarrassment here, as in other disputes concerning chattels seized as the property of a debtor in execution. But in no case does indemnity affect the sheriff’s authority, or give a new rule for his conduct. It merely secures him against the consequences of a proceeding that may turn out to be unlawful. With and without indemnity to the sheriff, the rights of the various creditors would here have been the same.
It has been supposed that, in a case like this, justice, according to the true rights of creditors and opposing claimant, may be done by deducting from the value of the property sold the amount due to subsequent creditors, and finding against the pur *132 chaser the remainder of the true damages of the plaintiff. This would be to shift the responsibility of decisions, proper only for Courts, from the sheriff to the purchasers, and would necessarily lead to the sacrifice of property for want of bidders. If the sheriff has authority to sell, the purchaser need look no further, but acquires such right as the sheriff sold. We must not establish a rule which would operate only when the same person was purchaser of all the chattels sold, and would compel him to bear the burden of a law-suit for settlement of the rights of other persons; but a rule under which a prudent purchaser, having ascertained the rights of the debtor and the authority of the sheriff, may safely conclude that he has acquired whatever any creditor, whose agent the sheriff when selling was, might rightfully claim to have from the debtor. The sheriff was the agent of every subsequent creditor having execution, until that execution was satisfied in the regular order of priority.
2. We are then satisfied that the instructions given to the jury were wrong in holding that the sheriff’s authority ceased, if the proceeds of the first parcel sold were equal to or greater than the amount due upon the executions of all the subsequent creditors who had been really deceived by the transaction complained of, notwithstanding older executions remained unsatisfied. For this error a new trial would seem to be necessary, but it is said that the error was immaterial, for the jury have found the value of all the slaves, and so have shewn that they did not find that there was any subsequent creditor, whose rights, under the instructions given, would, pro tanto, have protected the defendant. We cannot safely conclude any thing as to the process by which the amount of the verdict was fixed, and must suppose that the instructions given to them were regarded by the jury. It is hardly presumable that, without any evidence whatever to rebut the presumptions by which they should have been guided, the jury have found that neither Price nor any of the ten execution creditors had trusted Elkin on the faith of these slaves. The intimation that they may have done so requires, however, that we should bestow a hasty notice upon the 3d and 5th grounds of *133 appeal, which are applicable to all the subsequent creditors, including Buchanan.
That every contract and transaction, whereby a party in evil design has contrived to perpetrate a positive fraud upon another, should, in a contest between that party and the person defrauded, or between their several representatives, be held void, is law which the common sense of every impartial juror will recognise. Not less certain, if a little less plain, is the law which holds that a party who enables another to commit a fraud, is answerable for the consequences; that one who designedly or knowingly produces a false impression, whereby another is drawn into some act or contract, injurious to that other’s rights or interests, has done the same harm which an actual fraud would have produced, although he may have had no actual fraudulent intention, and should not be permitted to take benefit from his own wrong ; and that gross negligence in giving the information, which ought to have been given to prevent a false impression, is equivalent to intentional concealment.
Where chattels pass from a father-in-law to the son-in-law, and no contrary explanation of the transaction is given, the presume tion is that this has become the property of the son-in-law; and this is so consistent with the habits of the country and the decisions of our Courts, and is so generally understood, that every person may be expected to act upon the impressions which the transaction is calculated to produce. Between the parties, private arrangements may avail to control the ordinary presumption ; but third persons, knowing nothing, and having no adequate means afforded to them of knowing any thing of these arrangements, must draw the ordinary inference, and act accordingly. Thence the anxiety of the law, by registry acts and other regulations, to guard creditors and purchasers against the exceptions which marriage settlements, deeds of trust, and other solemn writings may make, from the ordinary results that attend a transfer of possession from father-in-law to son-in-law. If, in violation of the wise principle upon which all these regulations are founded, a stipulation of a loan for an indefinite time, or of rights *134 reserved by the father-in-law, may be made by some informal instrument, and that instrument, without any recording or public notice given of it, may afterwards be produced to defeat the rights of creditors or purchasers, who have trusted to the visible and unexplained possession of the property, injury most grievous and unjust may be done, and this when the parties have acte$ without the least intention of fraud.
In the case before us, the loose agreement signed by Elkin to pay $>25 hire, or return the slaves when called for, to Ford, shews that no real contract of hiring was ever intended; and that, coupled with the facts that no hire was ever paid or demanded, or expected by Elkin to be paid, make the paper itself evidence of either an absolute gift, or of a gift accompanied with the reservation of some unusual and indefinite right in the donor, such as justly excites suspicion of unfairness. Elkin’s refusal to accept the slaves as a gift, betrays a consciousness, on his part, of the dangerous condition of his affairs, and his desire of a settlement on his wife and children points to the nature of the interest which the parties may have wished to secure in this property, and the principles which should be applied to the instrument they adopted. The continued and unquestioned possession of Elkin for nine years before Ford’s claims were made public, and the circumstances that the only witness to the paper was a female living out of the district, and that no person appears ever to have seen the paper from 1834 till 1843, impute to Ford, at least, blameable negligence in suffering other persons to be misled by the appearances he had contributed to produce. The treatment of the property by Elkin as his own, his acknowledgments that he had never mentioned Ford’s rights therein to any person, besides five friends, and that he could not be sure as to the time of his communication to any of them ; the failure of the only two of these friends that could be produced to remember any time when he spoke to them on the subject before his litigation with Aiken; and his sharp reproach of Thomas Stanton, and positive assertion to him that the negroes were his own, seem strongly to lead to the conclusion, that, whatever may have *135 been the original design, there was subsequently existing, at least on Elkin’s part, an intention willingly and knowingly to deceive those who were misled by his possession of the slaves.
From these circumstances we think it might fairly be inferred that the receipt was only a contrivance to meet contingencies, never to be resorted to if Elkin’s affairs should continue prosperous, but to be brought out, if it should be needed, to save the property for the enjoyment of his family. It could not have been brought out, in case of need, without injury to creditors or purchasers; and therefore, upon this supposition, the original scheme contemplated advantage to the parties, or one of them, at the cost of innocent sufferers, and so was unfair and unworthy of the sanction of the Court. But if no design existed, beyond the purpose of maintaining the title in Ford, come good or ill, still those creditors who have been misled by the false impression which was necessarily produced, may treat the slaves according to the appearances exhibited, as the property of Elkin. And when they have shewn the subsequent extension of credit to him, it is not for Ford to require them to shew that they knew of Elkin’s possession, or had faith in this property when they trusted him. In consideration of the ready means of intelligence which exist throughout this country, and of the vigilant selfishness which guards private interests, it must be presumed that every subsequent creditor did know of the possession, and did, in extending credit, regard all the means which he might reasonably conclude belonged to his debtor; unless such creditor be shewn to have had for himself that notice of the true condition of the property, which it was the duty of the parties to an' arrangement that altered the presumptions raised by appearances, to have furnished to the whole community.
There are other questions involved in the case which it is unnecessary now to consider.
The motion for new trial is granted.
O’Neall, Frost, Withers and Whitner, JJ., concurred.